IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| REYBOLD CONSTRUCTION CORPORATION, : <br> : <br> Plaintiff, : <br> : C.A. No. 08-374-JJF <br> v. : <br> : <br> RALPH GREBOW, : JURY TRIAL DEMANDED <br> : <br> Defendant. : | |

## ANSWER AND AFFIRMATIVE DEFENSES OF DEFENDANT RALPH GREBOW

Defendant Ralph Grebow ("Grebow" or "Defendant") answers the Complaint of plaintiff Reybold Construction Corporation ("Reybold Construction" and "Plaintiff") according to the numbered paragraphs thereof and asserts his affirmative defenses, as follows:

1. Admitted.

2. Denied in part; admitted in part. It is admitted only that Grebow resides in New Jersey. All remaining allegations contained in paragraph 2 of the Complaint are denied.

3. Denied in part; admitted in part. It is admitted only that Atlantic Meridian Crossing, LLC ("Atlantic Meridian") entered into an AIA A101-1997 Standard Form of Agreement between Owner and Contractor dated September 26, 2005 (the "AIA Agreement") for certain construction and services in the amount of $10,435,000. All remaining allegations contained in paragraph 3 of the Complaint are denied.

4. Denied in part; admitted in part. It is admitted that Reybold requested that Grebow provide a personal guaranty. All remaining allegations contained in paragraph 4 of the Complaint are denied.

5. Admitted.

6. Denied in part; admitted in part. It is admitted only that Reybold Construction, Atlantic Meridian and Grebow entered into a First Amendment of Agreement (the

"Amendment"). The remaining allegations of paragraph 6 of the Complaint are denied.

7. Denied in part; admitted in part. It is admitted that paragraph 7 accurately quotes a portion of the Amendment. It is specifically denied that the quoted statements are true or accurate. The remaining allegations of in paragraph 7 of the Complaint are denied.

8. Admitted in part; denied in part. It is admitted only that defendant was coerced into agreeing to pay a $1,500,000 penalty if Atlantic Meridian Crossing LLC defaulted under certain lot purchase agreements. The remaining allegations of paragraph 8 of the Complaint are denied.

9. Denied in part; admitted in part. It is admitted only that Atlantic Meridian did not purchase 131 lots that were subject to various lot purchase agreements. The remaining allegations contained in paragraph 9 of the Complaint are denied.

10. Denied in part; admitted in part. It is admitted only that Reybold Construction purported to declare Ralph Grebow and Atlantic Meridian in default of the AIA Agreement and Amendment, by letters dated February 29, 2008, wherein it demanded payment of the $1,500,000. The remaining allegations contained in paragraph 10 of the Complaint are denied.

11. Denied in part; admitted in part. It is admitted only that Grebow has refused to pay $1,500,000 to Reybold Construction. It is specifically denied that Grebow is obligated to pay $1,500,000 to Reybold Construction. The remaining allegations of paragraph 11 are denied.

12. Denied.

13. Denied.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

14. Reybold Construction's Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

15. There was a complete failure and lack of consideration for Atlantic Meridian's agreement to pay $1,500,000 in the event that it did not close on the purchase of the subsequent phases of the Meridian Community and for Grebow's guarantee of that undertaking because the damages for which Atlantic Meridian would have been liable if it defaulted under the AIA Agreement after failing to close on the subsequent phases of the Meridian Community were far less than the purported liquidated damages specified in the March Amendment. As such, the consideration purportedly provided to Atlantic Meridian of a limitation of liability is illusory.

### Third Affirmative Defense

16. Upon information and belief, the Reybold Venture Group XI-A, LLC ("RVG XI-A"), Reybold Venture Group XI-B, LLC ("RVG XI-B"), Reybold Venture Group XI-XV, LLC ("RVG XI-XV"), Reybold Venture Group XI-C, LLC ("RVG XI-C"), Reybold Venture Group XI-D, LLC ("RVG XI-D"), Reybold Venture Group XI-E, LLC ("RVG XI-E") and Reybold Venture Group XI-F, LLC ("RVG XI-F") (collectively the "Reybold Entities") have been the owner of an undeveloped parcel of real estate located in Bear, Delaware since some time prior to 2002.

17. Upon information and belief, the Reybold Entities are affiliated with Reybold Construction through common ownership, management and/or control.

18. Upon information and belief, prior to 2002, the Reybold Entities planned the development of a residential community on the parcel of property they owned in Bear Delaware.

They planned for this community to consist, among others, of single family homes, town homes, an over 55 community, rental properties and service facilities, such as a day care, and operate under the name of Meridian Crossing and Meridian Crossing II (collectively "Meridian Community"). The Reybold Entities also planned to provide a community center, pool and other common area amenities as part of the Meridian Community.

19. Upon information and belief, the Reybold Entities undertook the development of the over 55 community, rental properties and other portions of the Meridian Community.

20. Upon information and belief, in or about 2005, the Reybold Entities entered into negotiations with NVR, Inc. ("NVR"), a publicly traded corporation in the business of residential development, to sell approximately 391 Lots (the "Lots") constituting the remainder of Meridian Crossing and all of Meridian Crossing II to NVR to construct single family and town homes.

21. The Reybold Entities and NVR negotiated the price of the Lots, architectural style and standards for the residences NVR was to construct and other terms and conditions upon which the Meridian Community would be developed. As contemplated by the Reybold Entities and NVR, Reybold Construction was to undertake site improvements, including constructing roads and installing utility service, to the Meridian Community before selling the Lots to NVR.

22. Upon information and belief, if the Reybold Entities sold site improved lots to NVR, they would not be able to claim capital gains tax treatment on the sale and would, accordingly, incur millions of dollars in additional tax liabilities.

23. Therefore, after NVR introduced the Reybold Entities to Atlantic Meridian, they solicited Atlantic Meridian to act as an intermediary and/or agent in the sale transaction and to engage in a joint venture to develop the Meridian Community.

24. The Reybold Entities and Atlantic Meridian agreed that Atlantic Meridian would purchase the undeveloped Lots from the Reybold Entities and engage Reybold Construction to

perform site work on the Lots. In turn, Atlantic Meridian would sell the improved Lots to NVR on terms that the Reybold Entities had already negotiated.

25. The Reybold Entities, Reybold Construction and Atlantic Meridian also agreed to work together to develop and market the Meridian Community, including paying for the costs to install public utilities and the costs of constructing the common area facilities and other amenities in the Meridian Community in proportion to the percentage of the development the Reybold Entities would retain (51%) and Atlantic Meridian would ultimately purchase (49%).

26. In a series of lot purchase agreements dated September 26, 2005 and October 26, 2005, Atlantic Meridian agreed to purchase the Lots from the Reybold Entities. Each lot purchase agreement covered a specific group of the Lots and segregated the closings into two general phases. Atlantic Meridian deposited approximately $3.5 million under each of the lot purchase agreements and in connection with a Letter Agreement dated November 6, 2006 between Reybold Construction and Atlantic Meridian. It was agreed that the deposits would be applied to the purchase price of the Lots at the time of closing.

27. Reybold Construction and Atlantic Meridian entered into the AIA Agreement to perform site improvements to that portion of the Meridian Community in which the Lots were located, including, but not limited to, the construction of roadways, sidewalks and sewers, in exchange for a total payment of Ten Million, Four Hundred and Thirty-Five Thousand Dollars ($10,435,000) (the "AIA Agreement"). The AIA Agreement specified that construction was to proceed in accordance with a specific schedule of construction for the entire Meridian Community.

28. At the same time as the execution of the lot purchase agreements and Construction Contracts, NVR and Atlantic Meridian entered into a series of lot purchase agreements pursuant to which NVR agreed to purchase, and Atlantic Meridian agreed to sell, the

Lots at a price sufficient: (i) to cover Atlantic Meridian's costs of acquisition, of improving the Lots, of constructing the community property and amenities and of financing the transaction; and (ii) provide it a profit.

29. At the time of the execution of the lot purchase agreements, NVR deposited $4,200,000 towards the purchase price of the Lots, which funds Atlantic Meridian used to make the deposits required under the lot purchase agreements with the Reybold Entities. Defendant Grebow personally guaranteed the return of the NVR deposits in the event Atlantic Meridian defaulted under the lot purchase agreements with NVR.

30. Atlantic Meridian would also use the NVR payments to reimburse it for the costs of purchasing the Lots. The closings on Atlantic Meridian's purchase of the Lots were divided into phases because NVR was to purchase the Lots on a staggered basis.

31. After the parties' executed the aforementioned agreements, the housing market began to slow and it became more difficult to sell new homes. Once the market began to turn, the Reybold Entities, acting in concert with Reybold Construction, pursued a calculated course of conduct to impose the losses that may occur from this downturn upon Atlantic Meridian even though it was agreed that Atlantic Meridian should bear minimal risk in this relationship.

32. Atlantic Meridian required financing to close on the purchase of the Lots in order to fund part of the purchase price until NVR purchased all of the Lots. Atlantic Meridian timely received a commitment from Provident Bank for a non-recourse loan subject to Provident's obtaining participation from another bank. Provident Bank sought to obtain participation from Franklin Bank. Franklin Bank unduly and wrongfully delayed in responding to the request to participate and belatedly insisted that some part of the amount of its participation be with recourse to defendant Grebow as a principal in Atlantic. Once Franklin Bank took this position, Provident Bank demanded that the entire loan be recourse.

6

33. It is believed that the Reybold Entities knew of these issues because they were represented by the same law firm as Franklin Bank.

34. Armed with this knowledge, Reybold Construction, acting in concert with the Reybold Entities, accelerated the pace of site improvements beyond the project schedule set forth on Schedule 3.3 to the AIA Agreement and well before construction was to commence on homes in the latter phases of the Meridian Community.

35. Performing this worked created a lien interest on the Lots. As a result of this lien interest, the Reybold Entities could not deliver clear title to Atlantic Meridian as required in the lot purchase agreements.

36. Even though the Reybold Entities could not deliver the quality of title required by the lot purchase agreements, they declared Atlantic Meridian in default under the lot purchase agreements for the first phase of the Meridian Community when it did not close within the time period specified in the lot purchase agreements because of issues it incurred in obtaining financing.

37. This conduct placed Atlantic Meridian in an untenable position because it could not proceed forward with financing until Atlantic Meridian cured the claimed default.

38. In order to rescind their notices of default, acting in concert with Reybold Construction, the Reybold Entities demanded, *inter alia*, that Atlantic Meridian agree to pay $1,500,000 in purported liquidated damages under the AIA Agreement if it failed to proceed with the subsequent phases of closings and that Ralph Grebrow personally guarantee this payment.

39. The Reybold Entities and Reybold Construction made these demands because they knew Atlantic Meridian had not secured financing for the subsequent phases of closings and may not be able to obtain financing given the downturn in the new home market. They sought to

foist on Atlantic Meridian and Grebow the costs of the site improvements to the subsequent phases of Lots.

40. Caught between the rock of the unconscionable business conduct of the Reybold Entities and Reybold Construction, and the hard place of Atlantic Meridian's contractual obligations to sell the Lots to NVR and Grebow's personal guarantee of the return of NVR's deposits, Atlantic Meridian and Ralph Grebow had no alternative but to agree to the Reybold Entities' demands.

41. On or about March 10, 2006, the Reybold Entities and Atlantic Meridian executed Amended and Restated Agreements of Sale for the Lots pursuant to which, *inter alia*, the closings on Atlantic Meridian's purchase were segregated into three phases, with twenty-four of the Lots that were to be included in the first phase of closings grouped into a second phase of closings and the time period for the closings on the remaining Lots extended into a third phase.

42. Contemporaneously, Atlantic Meridian and Grebow also executed the March Amendment with Reybold Construction.

43. The provision in the Amendment for Atlantic Meridian to pay $1,500,000 in the event it did not proceed with the closings on the subsequent phases of the Lots and defendant Grebow to guarantee of that payment are accordingly unenforceable as coerced by the wrongful actions, breaches of fiduciary duty and commercially unreasonable actions of Reybold Construction acting in concert with the Reybold Entities.

### Fourth Affirmative Defense

44. Atlantic Meridian agreed to pay $1,500,000 as purported liquidated damages under the AIA Agreement in the event that it did not proceed to closing on the subsequent phases of the Lots and defendant Grebow's guaranteed that payment acting under duress. Those undertakings are accordingly unenforceable.

8

### Fifth Affirmative Defense

45. Reybold Construction is estopped from enforcing Grebow's guarantee by its wrongful and commercially unreasonably conduct acting in concert with the Reybold Entities.

### Sixth Affirmative Defense

46. In demanding that Atlantic Meridian agree to pay $1,500,000 in the event it did not proceed to closing on the subsequent phases of the Lots and that defendant Grebow guarantee that undertaking, the Reybold Entities breached their fiduciary duties to Atlantic Meridian. As Reybold Construction benefited from the Reybold Entities' breach of fiduciary duty, and acted in concert and is affiliated with those entities, it cannot enforce Atlantic Meridian's agreement or defendant Grebow's guarantee.

### Seventh Affirmative Defense

47. On or about March 10, 2006, closings were held on the first phase of the Lots. At the closings, Atlantic Meridian's rights under the lot purchase agreements were assigned to Meridian Crossing Funding Company, Inc. ("Meridian Company") and it took title to the Lots.

48. Atlantic Meridian and Meridian Company fully paid Reybold Construction for the site improvement work performed on the first phase of the Lots.

49. After the closing on the first phase of Lots, NVR began purchasing them and commenced home construction.

50. By the summer of 2007, the decline in the new home market had worsened as a result of the so-called "sub-prime crisis," rampant homeowner defaults on existing balloon mortgages, rising energy prices and the downturn in the economy. There was a glut of unsold homes on the market, sources of credit evaporated and lenders willing to extend mortgages demanded lower loan to value ratios and higher income levels for comparable loans. As a result, the prices buyers could afford to pay for a home declined.

51. As a result of these market and economic factors, NVR was able to generate few

sales at the Meridian Community.

52.  Upon information and belief, NVR concluded that, given the precipitous decline in the new home market and economic down turn, it could not sell homes in the area in which the Meridian Community is located at the prices necessary to cover the costs of building in conformity with the existing architectural standards, site improvements and land acquisition prices.

53.  NVR accordingly sought accommodations from Atlantic Meridian and the Reybold Entities in the existing architectural standards, scope of site improvements and land prices in order to reduce its costs to a level that it could sell homes at marketable prices under the existing economic conditions.

54.  While Atlantic Meridian agreed to concessions within its ability to provide, the Reybold Entities rejected NVR's requests.

55.  As a direct and proximate result of the Reybold Entities' rejection of NVR's requests for accommodations, NVR abandoned the project.

56.  Once NVR defaulted, Atlantic Meridian and Meridian Company could not resell the Lots. There was no economic basis to move forward with closing on the remaining Lots and Atlantic Meridian could not, in any event, obtain financing to close on the remaining phases of Lots.

57.  Atlantic Meridian accordingly did not proceed to closing on the remaining Lots and terminated the AIA Agreement.

58.  As the Reybold Entities, acting in violation of their fiduciary duties and in concert with their affiliated entity Reybold Construction, prevented Atlantic Meridian from closing on the remaining Lots, Reybold Construction is estopped and otherwise barred from enforcing the purported liquidated damages provision of the Amendment.

**Eighth Affirmative Defense**

59.     Notwithstanding any other statement in the Amendment, which such provisions were coerced and executed under duress, Atlantic Meridian's agreement to pay $1,500,000 in the event that it did not close on the purchase of the subsequent phases of the Meridian Community and Grebow's guarantee of that undertaking are unenforceable penalties in that: (i) any damages Reybold Construction would incur if Atlantic Meridian defaulted under the AIA Agreement are readily calculable; (ii) the AIA Agreement does not contain a liquidated damages clause; (iii) $1,500,000 is not a fair estimate of the damages Reybold Construction would incur if the Atlantic Meridian did not close on the purchase of all the Lots subject to the lot purchase agreements and defaulted upon the provisions of the AIA Agreement providing for Reybold Construction to perform site improvements to those Lots; (iv) any actual damages Reybold Construction would incur from a default under the AIA Agreement are substantially less than $1,500,000; (v) Reybold Construction's affiliated entities would obtain the benefit of any work performed on those Lots; (vi) Reybold Construction's affiliated entities would pursue liquidated damages claims if Atlantic Meridian defaulted on the lot purchase agreements which would fully compensate them for any loss of the benefit of the bargain; and/or (vii) the Lots will ultimately be developed and Reybold Construction will perform the site work necessary to develop the Lots.

**Ninth Affirmative Defense**

60.     Plaintiff's claims are barred or diminished by the doctrine of unclean hands.

**Tenth Affirmative Defense**

61.     Plaintiff's claims are barred in whole or in part because Plaintiff has failed to mitigate its alleged damages.

PHILADELPHIA\3669414\3 219965.000

**Eleventh Affirmative Defense**

62.  Plaintiff's claims are barred because the agreements are unenforceable, void and/or should be rescinded or cancelled because Plaintiff breached the implied covenant of good faith and fair dealing.

WHEREFORE, defendant Ralph Grebow demands judgment in his favor and against Reybold Construction Corporation, together with costs and such other relief as the Court may deem just and proper.

Dated: July 9, 2008

/s/ David A. Felice
David A. Felice (#4090)
Cozen O'Connor
1201 North Market Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2000
Facsimile: (302) 295-2013
*Attorneys for Defendant*

*Of Counsel:*
Robert W. Hayes, Esquire
Mia Meloni, Esquire
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103
Telephone: (215) 665-2000

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| REYBOLD CONSTRUCTION CORPORATION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | C.A. No. 08-374-JJF |
| v. | : | |
| | : | |
| RALPH GREBOW, | : | JURY TRIAL DEMANDED |
| | : | |
| Defendant. | : | |

## CERTIFICATE OF SERVICE

I, David A. Felice do hereby certify that on July 9, 2008, I electronically filed the foregoing *Answer and Affirmative Defenses of Defendant Ralph Grebow* with the Clerk of Court using CM/ECF which will send notification of such filing to the following counsel of record:

John H. Newcomer, Jr., Esquire
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801

I further certify that on July 9, 2008, a true and correct copy of the foregoing *Answer and Affirmative Defenses of Defendant Ralph Grebow* was caused to be served upon the following counsel in the manner indicated:

**Via First Class Mail**
Jeffrey M. Weiner, Esquire
Law Offices of Jeffrey M. Weiner, P.A.
1332 King Street
Wilmington, Delaware 19801

*David A. Felice*
David A. Felice (#4090)
Cozen O'Connor
1201 North Market Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2000
Facsimile: (302) 295-2013
*Attorneys for Defendant*

PHILADELPHIA\3669414\3 219965.000